## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,**

           **Plaintiff,**

   **v.**

**SHARON DAVIDSON, THE ESTATE OF FRANK W. DAVIDSON, MATTHEW T. DAVIDSON, and BRYAN JAMES DAVIDSON,**

           **Defendants.**

**MATTHEW T. DAVIDSON and BRYAN JAMES DAVIDSON,**

           **Cross Claimants**

   **v.**

**SHARON DAVIDSON,**

           **Cross Defendant**

        **1:14-cv-1879-WSD**

## OPINION AND ORDER

This matter is before the Court on Prudential Insurance Company of America's ("Plaintiff") and Sharon Davidson's ("Sharon"), the Estate of Frank W. Davidson's ("Estate"), Matthew T. Davidson's ("Matthew") and

Bryan James Davidson's ("James") (together, "Defendants") Joint Motion to Interplead and Dismiss Plaintiff The Prudential Insurance Company of America with Prejudice [11] ("Joint Motion").  Also before the Court is Sharon's Motion for Summary Judgment [14] ("Motion").

## I.    BACKGROUND

### A.    Complaint in Interpleader and Joint Motion

On June 17, 2014, Plaintiff filed its Complaint in Interpleader [1] ("Complaint").  Plaintiff asserts that it issued, to Lockheed Martin Corporation ("Lockheed"), group life insurance policy number G-23747 for basic life insurance coverage ("Plan A") and policy number G-43406 for accidental death and dismemberment insurance coverage ("Plan B") of Lockheed employees (together, the "Plans").  (Compl. ¶ 9).  Frank W. Davidson ("Frank"), a Lockheed employee, had life insurance coverage in the amount of $34,000 under Plan A ("Plan A Death Benefits") and $534,000 under Plan B ("Plan B Death Benefits") (together, the "Death Benefits").  (Id. ¶¶ 10, 14).  Frank designated his wife, Sharon, as his beneficiary under the Plans.  (Id. ¶¶ 11-12).

On April 22, 2013, Frank died from multiple gunshot wounds.  (Id. ¶ 13).  The death is being investigated as a homicide.  (Id.).

2

On May 23, 2013, Sharon asserted a claim to the Death Benefits.  (Id. ¶ 15). Plaintiff asserts that Sharon is a suspect in connection with Frank's death and, if it is shown that she murdered or conspired to murder Frank she would, under Georgia law, forfeit any right she had to the Death Benefits.  (Id. ¶¶ 16-17).  If Sharon's right to the Death Benefits is forfeited under Georgia Law, the Plan A Death Benefits would be paid to Frank's surviving children, Matthew and Bryan, in equal shares.  (Id. ¶¶ 19-21).  The Plan B Death Benefits would be paid to Frank's Estate.  (Id.).

Plaintiff asserts that it is ready and willing to pay the Death Benefits in accordance with the terms of the Plans, but cannot determine who is entitled to them.  (Id. ¶¶ 23-24).  As a result, there are potential conflicting claims to the Death Benefits and Plaintiff "is or may be exposed to multiple liability."  (Id. ¶ 23).  Plaintiff requests that it be allowed to deposit the amount of the Death Benefits into the Registry of the Court and that the Court determine to whom the Death Benefits should be paid.  (Id. ¶¶ 25-26).

On November 17, 2014, Plaintiff and Defendants filed the Joint Motion, requesting that the Court enter an order, pursuant to Rules 22 and 67 of the Federal Rules of Civil Procedure: (1) directing Plaintiff to deposit with the Clerk of Court the amount of $568,000.00, together with accrued interest; (2) discharging Plaintiff

of all liability; (3) dismissing with prejudice all claims against Plaintiff relating to the Plans and the Death Benefits; and (4) dismissing Plaintiff from this action without costs to any party.

       B.      <u>Cross Claims and Motion for Summary Judgment</u>

On August 29, 2014, Matthew and Bryan ("Cross Claimants") filed their Cross Claims [9] ("Cross Claims")[1] against Sharon and the Estate.  The Cross Claims restate many of the allegations in the Complaint, including that the Plans name Sharon as the sole beneficiary, that Frank was killed by multiple gunshot wounds to the head, and that Sharon is a suspect in the murder investigation but has not been arrested.  (Cross-Cl. ¶¶ 9-15).  They claim further that if is shown that Sharon murdered or conspired to murder Frank, she would not be entitled to receive the Death Benefits.  (<u>Id.</u> ¶¶ 16-17).  Cross Claimants also allege that if Sharon is found to have murdered or conspired to murder Frank, the Plan A Death Benefits would be payable to Cross Claimants, and the Plan B Death Benefits would be payable to the Estate.  (<u>Id.</u> ¶ 19).[2]

Cross Claimants allege that Sharon murdered, or conspired to murder, Frank, and they raise numerous factual allegations in support of this assertion.  (<u>Id.</u>

---

[1]      The Cross Claims begins on page 7 of Docket No. 9.

[2]      The Estate currently is being administered by Sharon.  (Cross-Cl. ¶ 19).

¶¶ 20-21).[3]  Cross Claimants allege claims for: (1) payment of the Death Benefits to Cross Claimants or the Estate, as appropriate (Count One); (2) Full Value of the Life of Frank Davidson (Count Two); (3) Assault and Battery (Count Three); (4) Loss of Consortium (Count Four); (5) Funeral, Burial, Medical, and Other Necessary Expenses (Count Five); (6) an Accounting (Count Six); (7) Imposition of Lien on Assets of the Estate of Frank Davidson and Injunctive Relief (Count Seven); (8) Punitive Damages (Count Eight); and (9) Attorney's Fees (Count Nine).

On September 12, 2014, Sharon filed her Answer [10] to the Cross Claim. In it, Sharon admits the Plans exist, that she is the designated beneficiary, and that Frank was murdered on April 22, 2013, as a result of multiple gunshot wounds to his head.  (Answer ¶¶ 9-12).  Sharon denies knowing if she is a suspect in Frank's murder, and she denies any involvement in his murder.  (Id. ¶¶ 15-16, 18-19).

On February 23, 2015, Sharon filed her Motion, arguing she is entitled to summary judgment on Count One of the Cross Claims and that the Court should decline exercising supplemental jurisdiction on the remaining state-law counts or, in the alternative, grant her summary judgment on the state law counts.  (Mot. at 2).  Sharon asserts that she "did not kill Frank," "did not conspire with anyone to

---

[3]     The Court will address the factual allegations in this case when it considers Sharon's Motion.

kill Frank," "did not participate in the killing of Frank . . . in any way," "had

nothing to do with causing [Frank's] death," "[has] not been arrested for the death

of Frank," and "[has] not been prosecuted for the death of Frank . . . ." (Sharon

Decl. [14-3] ¶¶ 3-8).

## II.   DISCUSSION ON THE JOINT MOTION TO INTERPLEAD AND DISMISS

### A.   Legal Standard

Rule 22 of the Federal Rules of Civil Procedure provides that "[p]ersons

with claims that may expose a plaintiff to double or multiple liability may be

joined as defendants and required to interplead."  Fed. R. Civ. P. 22(a)(1).  Rule 67

of the Federal Rules of Civil Procedure provides that if "any part of the relief

sought is a money judgment or the disposition of a sum of money or some other

deliverable thing, a party--on notice to every other party and by leave of

court--may deposit with the court all or part of the money or thing, whether or not

that party claims any of it."  Fed. R. Civ. P. 67(a).

### B.   Analysis

Plaintiff asserts that it is ready and willing to pay the Death Benefits in

accordance with the terms of the Plans, but cannot determine factually or legally

who is entitled to the Death Benefits.  (Compl. ¶¶ 23-24).  Defendants' potential

conflicting claims to the Death Benefits open, or potentially expose, Plaintiff to multiple liability.  (Id. ¶ 23).

Plaintiff and Defendants assert that Plaintiff should be allowed to deposit the Death Benefits into the Registry of the Court and should then be dismissed from this action with prejudice.  (Joint Mot. at 1-2).  The Court agrees with the relief requested and the Joint Motion is granted.

## III.   DISCUSSION ON SHARON'S MOTION FOR SUMMARY JUDGMENT

### A.    Legal Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Parties "asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this

burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  Non-moving parties "need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings."  Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but only "to the extent supportable by the record."  Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8 (2007)).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B.     Facts In Support of Motion

Sharon asserts, in a sworn declaration, that she "did not kill Frank," "did not conspire with anyone to kill Frank," "did not participate in the killing of

Frank . . . in any way," "had nothing to do with causing [Frank's] death," "[has] not been arrested for the death of Frank," and "[has] not been prosecuted for the death of Frank . . . ." (Sharon Decl. ¶¶ 3-8). Sharon does not provide any other evidence to support her statements that she did not murder or conspire to murder Frank.

     C.    <u>Facts In Opposition to Motion</u>

Cross Claimants, in opposition of Sharon's Motion, submit sworn affidavits from: (1) Matthew [15-1] ("Matthew Affidavit"); (2) Bryan [15-3] (Bryan Affidavit); (3) Ginger Davidson ("Ginger"), Frank's sister, [15-2] ("Ginger Affidavit"); (4) Beatrice McHan ("McHan"), Frank's mother, [17] ("McHan Affidavit"); and (5) Robert Duncan ("Duncan"), a detective, [16] ("Duncan Affidavit").

Matthew, in his affidavit, states that the day after Frank's death, Sharon boxed up Frank's personal belongings without calling Matthew or Bryan, and without allowing them to see any of his personal possessions or correspondence. (Matthew Aff. ¶ 3). He states also that Sharon did not call Matthew to tell him of Frank's death. (<u>Id.</u> ¶ 4). Sharon, instead, sent her son-in-law, Zachery Evans, her daughter, Danielle Evans, and another person to tell Bryan his father had been murdered. (<u>Id.</u>). During their marriage, Sharon would frequently, and without

authorization, sign Frank's name to checks drawn on Frank's checking account. (<u>Id.</u> ¶ 5). Matthew also states that he discovered that Sharon had attempted to obtain a loan under her and Frank's name.[4] (<u>Id.</u> ¶ 8). When Sharon attempted to obtain a loan in his name, Frank did not know Sharon had made the application. (<u>Id.</u>). One week after Frank's murder, Sharon spoke with him as if nothing was wrong. (<u>Id.</u> ¶ 10). She refused to make eye contact with him when they spoke. (<u>Id.</u>).

Bryan states, in his affidavit, that on the day Frank was murdered, Sharon did not call him to tell him about his father's death, deciding instead to send Zachary Evans, Danielle Evans, and Tamara Poss--Sharon's daughter--to tell him of the murder. (Bryan Aff. ¶ 4). At the funeral, Sharon demanded that Bryan remove his cell phone from Frank's cell phone account. (<u>Id.</u> ¶ 3).

Frank's sister Ginger, in her affidavit, states that the day after Frank's murder she went to see Sharon. (Ginger Aff. ¶ 3). Sharon was on the back porch of her home smoking when she visited. (<u>Id.</u>). They talked about money. (<u>Id.</u>).

---

[4]     Matthew found out about the letter because it was addressed to Matthew's prior home, which was next door to Sharon and Frank's residence. Matthew Aff. ¶ 6). The Post Office forwarded the letter to his new residence. (<u>Id.</u> ¶¶ 6-7). Matthew states that he opened the letter, assuming it to be his, and discovered that, while it listed his old address, it was addressed to Sharon and Frank. (<u>Id.</u> ¶ 8). Matthew believes that Sharon was trying to obtain loans in Frank's name without Frank knowing, and was having mail sent to Matthew's old address to avoid Frank learning of the loan applications. (<u>Id.</u> ¶ 9).

Sharon complained that she did not have any money and that she intended to go to the bank later that afternoon.  (Id.).  Sharon said at some point she would get Frank's life insurance proceeds.  (Id.).  Sharon refused to look Ginger in the eye during the conversation.  (Id.).

Frank's mother, McHan, states in her affidavit that Frank always got into his car at approximately 5:30 a.m. to leave for work.  (McHan Aff. ¶ 3).  He turned on the carport light before getting into his car.  (Id.).  Frank was shot in his car in the carport.  (Id.).  The light fixture cover and the bulb in the carport were missing when the shooting was investigated.  (Id.).  The house in which Frank lived with Sharon, and which McHan owned at the time, is roughly 1,500 square feet with three bedrooms.  (Id. ¶ 4).  The carport is a short distance from the bedroom where Sharon slept.  (Id.).  In the year before Frank's death, Sharon consistently complained that "she had no life, could not bring friends around, and could not bring her grandchildren around, because of Frank's drinking."  (Id. ¶ 6).  Sharon told McHan that Frank was shot with his own gun, which was missing, and that Frank's keys to the house were also missing.  (Id. ¶ 7).  Despite the missing keys, and the possibility that Frank's murderer may have access to her home, Sharon refused to change the locks, stating "[i]f they [the murderer or murderers] had wanted me, they would have killed me then . . . ."  (Id. ¶ 8).

McHan states that Sharon initially claimed that Zach killed Frank.  (Id. ¶ 9).

Sharon claimed that "because Zachary Evans and Danielle Evans were in the midst

of a custody fight, she thought that Zachary Evans had apparently killed [Frank] to

get back at Sharon."  (Id.).  Three or four days after Frank's death, Sharon stated

that "Frank was killed as a result of some sort of road rage incident . . . ."  (Id.

¶ 10).

McHan states further:

[Sharon] would always park her car on the turnaround portion of the
driveway at the back door of the house behind the open carport.
Frankie would always park his car in the open carport.  When l saw
pictures of where Sharon's car was parked the night of Frankie's
murder, I noticed that she had parked her car where she had never
parked it before.  She was parked just off the driveway, by the side of
the carport, near Frankie's car.  The place where she was parked
would block the view of anyone looking at the carport or Frankie's
car, looking down Paul Samuel Road from Stilesboro Road.  When I
asked Sharon why her car was parked there that night, she said it was
to keep the "pine sap" from getting on her car.  I reminded her that I
had cut the pine trees down some time before.  She then gave me a
different excuse for parking there, that she was concerned the clear
coating on her car might peel because of the sun.

(Id. ¶ 11).  The dog did not bark that morning, even though he barked when

strangers approached the house.  (Id. ¶ 12).  Sharon claimed that she did not hear

gunshots the morning Frank was killed.  (Id. ¶ 13).

On April 25, 2005, Sharon pleaded guilty to aggravated assault in the Superior Court of Cobb County, Georgia for attempting to shoot Frank in October 2004.  (Id. ¶ 18, Exhibit A).  She served time for this conviction.  (Id.).[5]

Duncan, a detective for the Cobb County Police Department Homicide Unit in Marietta, Georgia, submitted an affidavit.  Duncan has been with the Homicide Unit for eight years, and he has investigated over fifty homicides in the last five years.  (Duncan Aff. ¶ 2).  Frank's murder investigation is assigned to him, and, while he does not yet have enough evidence to arrest or convict Sharon, "she is the prime suspect" in Frank's murder.  (Id. ¶ 3).

Duncan states that Sharon called 911 at 7:40 a.m. on the morning of Frank's murder, and was on the phone when the Cobb County Fire & Rescue Unit, near Frank and Sharon's residence, arrived.  (Id. ¶¶ 5-6).  While on the phone with 911, Sharon kept stating that she tried to move Frank's body.  (Id. ¶ 6).

Duncan arrived at the scene at approximately 8:25 a.m.  (Id. ¶ 7).  When he did, Sharon stated that she had tried to move Frank's body.  (Id.).  Frank had been

---

[5]     Exhibit A to the McHan Affidavit shows that on January 21, 2005, a criminal warrant for the 2004 incident was filed, charging Sharon with aggravated assault for "an assault upon the person of Frank Davidson, with a .38 calibre handgun, a deadly weapon, by chasing him and firing the handgun at him 5 times," and with reckless conduct for endangering Frank and nearby residences by "firing a handgun through the door and again outside towards nearby houses."  (McHan Aff. ¶ 18, Exhibit A).  Exhibit A reflects that, on April 25, 2005, Sharon pleaded guilty to aggravated assault.  (Id.)

shot twice in the head.  (<u>Id.</u>).  One of the bullets was found in his skull and the other in the vehicle.  (<u>Id.</u>).  Frank's body was completely out of his vehicle and had been dragged to a place near the steps of the carport leading into the house.  (<u>Id.</u>).  Frank was not a large man and Duncan believes that Sharon had the strength to move his body, alone or with assistance.  (<u>Id.</u>).

Duncan states there was blood all over the crime scene and Frank's body.  (<u>Id.</u> ¶ 8).  Sharon only had a small amount of blood on the bottom of her slippers.  (<u>Id.</u>).  If Sharon had attempted to move the body, she would have been covered in blood.  (<u>Id.</u>).  Sharon confirmed she did not shower or wash any blood off.  (<u>Id.</u>).  Based on Sharon's statements, Duncan believes Sharon lied about moving Frank's body.  (<u>Id.</u>).

Sharon initially stated she did not know when Frank usually left for Lockheed.  (<u>Id.</u> ¶ 9).  When later confronted by Duncan, Sharon confirmed that Frank usually left for work between 5:00 a.m. and 5:30 a.m.  (<u>Id.</u>).  Duncan states it would have been impossible for Sharon not to hear two gunshots from a .38 revolver that early in the morning, and, he believes, Sharon lied about not hearing gunshots.  (<u>Id.</u> ¶¶ 10-11).

Duncan notes additional inconsistencies in the statements Sharon made to the police regarding when she woke up on the morning of Frank's murder and

14

what she did prior to discovering the crime.  (Id. ¶¶ 15-17).  Sharon initially

claimed there had been no guns in the house since 2005, later admitting that a

Rossi .38 had been in the house after 2005, and that she would sometimes take the

Rossi .38 pistol to and from a neighbor's house.  (Id. ¶ 19).  The neighbor was

Ellen Gidding.  (Id.).  When told that Ms. Gidding stated Sharon had retrieved the

Rossi .38 from her home, Sharon admitted the firearm was kept in Sharon's home.

(Id.).  A Rossi .38 caliber handgun was the gun used by Sharon when she shot at

Frank in 2004.  (Id. ¶ 20).

Duncan confirmed that the bullets from the 2004 shooting matched the

bullets that killed Frank in 2013, and that the gun with which Sharon shot at Frank

in 2004, was the same gun used to kill him in 2013.  (Id. ¶¶ 21, 23-24).  Two

independent witnesses can confirm that Sharon previously stated, in reference to

Frank, that she would "kill that sonofabitch if she could get away with it . . . ."  (Id.

¶ 26).  Sharon also stated she was connected to a motorcycle gang in North

Georgia, and could have Frank killed.  (Id.).

In Duncan's interactions with Sharon, he noted she did not appear to be

upset over Frank's death, and she did not call him back about the investigation

until Duncan began telling individuals close to Sharon that he was amazed that she

did no seem upset over Frank's death and had not once cried over it.  (Id. ¶ 31).

Shortly after that, Sharon called Duncan and came to his office, where she started crying about Frank's death.  (Id.).

Duncan states that Sharon was obtaining credit cards in Frank's name, tried to get loans in his name, that Frank informed her that he was going to divorce her, and that she had borrowed $7,000 from Ms. Gidding some months before Frank's murder.  (Id. ¶¶ 27-28).

D.   Analysis

1.   Count One -Payment of the Death Benefits[6]

Georgia's "slayer statute" states:

> No person who commits murder or voluntary manslaughter or who conspires with another to commit murder shall receive any benefits from any insurance policy on the life of the deceased, even though the person so killing or conspiring be named beneficiary in the insurance policy.  A plea of guilty or a judicial finding of guilt not reversed or otherwise set aside as to any of such crimes shall be prima-facie evidence of guilt in determining rights under this Code section.  All right, interest, estate, and proceeds in such an insurance policy shall go to the other heirs of the deceased who may be entitled thereto by the laws of descent and distribution of this state, unless secondary beneficiaries be named in the policy, in which event such secondary beneficiaries shall take.

---

[6]   The Court has original jurisdiction over Count One pursuant to 29 U.S.C. § 1132(e), which gives federal district courts jurisdiction to hear civil cases related to benefits due under the terms of an employee welfare benefit plan, including those brought by a fiduciary.  The Policies at issue here are employee welfare plans governed by the Employee Retirement Income Security Act ("ERISA").  The parties do not challenge the Court's subject matter jurisdiction over Count One of the Cross Claims.

O.C.G.A § 33-25-13.[7]

Sharon conclusorily asserts that she did not murder or conspire to murder Frank, and thus is not barred under Georgia's slayer statute from receiving the Death Benefits.  (Mot. at 4-5).  She argues she has not been arrested or prosecuted for Frank's murder, and that Cross Claimants cannot establish "the prima-facie case that is specifically described in the second sentence of the statute."  (Id.).  Sharon thus argues the slayer statute does not ban her Death Benefits payments.  (Id.).  In advancing her argument, Sharon relies solely on the sworn statements in

---

[7]     Sharon and Cross Claimants agree that the slayer statute applies to this case. The Eleventh Circuit Court of Appeals has not yet determined whether ERISA preempts state slayer statutes.  The Supreme Court has noted, in a case involving the question of ERISA preemption of a different statute, that "the principle underlying the [slayer] statutes--which have been adopted by nearly every State--is well established in the law and has a long historical pedigree predating ERISA." Egelhoff v. Egelhoff ex rel. Breiner, 532 U.S. 141, 152 (2001).  Several district courts, relying on Egelhoff, have concluded that ERISA does not preempt state slayer statutes.  See Atwater v. Nortel Networks, Inc., 388 F. Supp. 2d 610, 614 (M.D.N.C. 2005); Admin. Comm. for the H.E.B. Inv. and Ret. Plan v. Harris, 217 F. Supp. 2d 759, 761 (E.D. Tex. 2002).  The parties do not assert that ERISA preempts Georgia's slayer statute.

The federal common law rule regarding slayers derives from the common law principle that no person should be permitted to profit from his own wrong. E.g., Prudential Ins. Co. v. Tull, 690 F.2d 848, 849 (4th Cir. 1982).  The Court notes Cross Claimants' assertion that Sharon murdered or conspired to murder Frank, if true, would prevent her from collecting the Death Benefits under both Georgia law and federal common-law.

her declaration that she did not murder or conspire to murder Frank.  (Id. at 4) (citing Sharon Decl. ¶¶ 7-8).

The Georgia Court of Appeals addressed substantially similar facts and claims in Cantera v. Am. Heritage Life Ins. Co., 617 S.E.2d 259 (Ga. Ct. App. 2005).  Cantera was an interpleader action was filed by American Heritage Life Insurance Company ("American Heritage").  The action concerned life insurance proceeds payable as a result of an insured's murder.  Jose Guerrero ("Guerrero") was the husband of the decedent Maurina Marquez ("Marquez"), who was murdered.  Cantera v. Am. Heritage Life Ins. Co., 617 S.E.2d 259, 260 (Ga. Ct. App. 2005).  She also had two children.  Id.  American Heritage alleged, and Guerrero admitted, that Marquez was murdered, and American Heritage also alleged that Guerrero was suspected of killing Marquez.  Id.

Guerrero filed for summary judgment seeking payment of the insurance proceeds due under Marquez's life insurance policy.  Id.  The motion was denied. Id.  Three years later, Guerrero filed a second motion for summary judgment, on the grounds "that he had been found not guilty by Mexican authorities for the murder of his wife" and stating again that he did not kill Marquez and did not participate or have any knowledge of her killing.  Id. at 260-61.  The trial court granted Guerrero's motion for summary.  Id. at 261.  The children appealed.  Id.

The Georgia Court of Appeals reversed, finding that "Guerrero's statements that he did not kill his wife are not competent evidence." Id. at 262. The Cantera court held that a "conclusion or allegation of the ultimate fact . . . . is not sufficient to support a motion for summary judgment." Id. (quoting Sullivan v. Fabe, 403 S.E.2d 208 (Ga. Ct. App. 1991)). A "party's averment in an affidavit that she did not murder her husband states only a conclusion which cannot be considered on summary judgment." Id. "In the absence of substantiating facts, a party's affidavit is self-serving and conclusory and cannot be used to support a motion for summary judgment." Id.

The Cantera court also held that Guerrero's claim that he was acquitted of Marquez's murder in Mexico, even if true, "would have no impact on the outcome of this civil case, which has a different burden of proof." Id. After excluding Guerrero's self-serving affidavit and his acquittal of murder, the Cantera court concluded the remaining admissible evidence, while not well developed, was sufficient to create a genuine issue of material fact when all inferences were taken in favor of the nonmovant children. Id.

Sharon relies solely on her self-serving sworn statements that conclusorily state that she "did not kill Frank," "did not conspire with anyone to kill Frank," "did not participate in the killing of Frank . . . in any way," "had nothing to do

with causing [Frank's] death," "[has] not been arrested for the death of Frank," and "[has] not been prosecuted for the death of Frank . . . ."  (Sharon Decl. ¶¶ 3-8). Sharon's self-serving and conclusory statements are insufficient to support her Motion where, as here, facts offered by Cross Claimants show there are disputed issues of fact.  See Cantera, 617 S.E.2d at 262.  Cross Claimants provide sworn affidavits of five individuals, including the detective investigating Frank's murder. These sworn statements, which allege that Sharon lied to Duncan during his investigation of Frank's murder, had financial issues that the payment of the Death Benefits would purportedly alleviate, and previously attempted to shoot Frank with the same gun that was later used to murder him, are sufficient to create a genuine issue of material fact, especially when all inferences are taken in favor of the nonmovant Cross Claimants.  See id.; see also Garczynski, 573 F.3d at 1165.

Sharon also argues that, because she has not been arrested or prosecuted, Cross Claimants cannot establish "the prima-facie case that is specifically described in the second sentence of the statute."  (Mot. at 4-5).  Sharon asserts that because Duncan states he "does not have enough [evidence] to arrest [Sharon]," Cross Claimants have acknowledged that probable cause to arrest Sharon for

Frank's murder does not exist.  (Reply [22] at 1).[8]  Sharon argues that because

probable cause is a less stringent standard than the preponderance of the evidence

standard at trial, no rational trier of fact could find in favor of Cross Claimant.  Id.

at 1-3.

Sharon does not cite authority, and the Court is likewise unaware of any, to

support her claim that summary judgment is warranted because a law enforcement

officer concludes he cannot arrest a person.  It is a question for this Court to

determine, whether on the facts presented on the Motion, there are disputed issues

of fact that preclude summary judgment.  Cf. Castro v. Ballesteros-Suarez, 213

P.3d 197, 204 (Az. Ct. App. 2009) (applying Arizona slayer statute and finding

that its provisions "may be invoked without having probable cause to arrest.").

The Court concludes the facts before it do not entitle Sharon to summary judgment

on Count One of the Cross Claims.

2.      Count Two - Full Value of the Life of Frank Davidson

Sharon's argument that she is entitled to summary judgment on Count Two

of the Cross Claims solely is based on her sworn statements that she did not

murder or conspire to murder Frank.  The Court, having concluded that a genuine

---

[8]      There are a variety of reasons a person may not be arrested even if there is
probable cause to do so, including to develop evidence of a crime for use before a
grand jury and at trial.  The Court notes that the investigation into Frank's murder
is ongoing.

issue of material fact exists regarding whether Sharon killed or conspired to kill Frank, determines that Sharon is not entitled to summary judgment on Count Two of the Cross Claims.  See Garczynski, 573 F.3d at 1165; see also Brown v. Liberty Oil & Ref. Corp., 403 S.E.2d 806, 808 (Ga. 1991) (holding that minor children can sue for wrongful death when the surviving spouse refuses to assert the claim).[9]

### 3.    Count Three - Assault and Battery Against Frank Davidson

Sharon next asserts that a claim for assault and battery vests, if at all, in the Estate and Cross Claimants do not have standing to raise this claim.  Cross Claimants argue that Sharon, as the personal representative of the Estate, breached her fiduciary duties to the Estate and that, accordingly, Cross Claimants are entitled to assert claims on behalf of the Estate that Sharon will not assert.  (Br. in Opp'n [20-1] at 26-28).  Cross Claimants rely on O.C.G.A. §§ 53-7-1 and 53-7-54 to support their argument.

---

[9]    The Court may exercise supplemental jurisdiction over Count Two, because Cross Claimants' wrongful death claim against Sharon would "involve the same witnesses, presentation of the same evidence, and determination of the same, or very similar, facts" as those the trier of fact would need to hear to determine liability on Count One.  See Palmer v. Hosp. Auth. of Randolph Cnty., 22 F.3d 1559, 1563-64 (11th Cir. 1994); 28 U.S.C. § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . .").

Section 53-7-1 provides that a personal representative is a fiduciary with specific duties imposed by law, and, as the personal representative, is required to "use the authority and powers conferred by law . . . to act in the best interests of all persons who are interested in the estate and with due regard for their respective rights." O.C.G.A. § 53-7-1(a).  Section 53-7-54(a) provides:

> If a personal representative or temporary administrator commits a breach of fiduciary duty or threatens to commit a breach of fiduciary duty, a beneficiary of a testate estate or heir of an intestate estate shall have a cause of action: (1) To recover damages; (2) To compel the performance of the personal representative's or temporary administrator's duties; (3) To enjoin the commission of a breach of fiduciary duty; (4) To compel the redress of a breach of fiduciary duty by payment of money or otherwise; (5) To appoint another personal representative or temporary administrator to take possession of the estate property and administer the estate; (6) To remove the personal representative or temporary administrator; and (7) To reduce or deny compensation to the personal representative or temporary administrator.

O.C.G.A. § 53-7-54(a).  Cross Claimants claim, pursuant to Section 53-7-54, that they have standing to assert a claim against Sharon for assault and battery.  (Br. in Opp'n at 27-28).  They allege that Sharon has breached her fiduciary duties to the Estate by failing to assert an assault and battery claim--which would have to be against herself--and Cross Claimants are, thus, entitled to assert a cause of action for assault and battery that would otherwise be enforceable only by the Estate.  (Id.).  Cross Claimants argue that whether Sharon breached her fiduciary duty to

the Estate by accepting the appointment as its personal representative and failing to pursue a wrongful death claim is a matter for the jury to decide. (Id. at 28).

Section 53-7-54(a) allows a cause of action to be brought to recover damages for breach of the fiduciary duty, to compel performance of the personal representative, to enjoin a personal representative's alleged breach of fiduciary duty, and other similar types of relief that are not applicable to Cross Claimants' assertion of an assault and battery claim on behalf of the Estate. See O.C.G.A. § 53-7-54(a). A cross-claim under Section 53-7-54(a) has not been asserted and whether Cross Claimants have standing to do so is not at issue in the Motion.

Cross Claimants' claim that Section 53-7-54(c) provides that the "provision of remedies for breach of fiduciary duty by this Code section does not prevent resort to any other appropriate remedy provided by statute or common law," and that subsection (c) gives them standing to assert Count Three on behalf of the Estate. (Br. in Opp'n at 27). Cross Claimants do not cite any "statute or common law," and the Court has likewise found none, to support their argument that the "any other appropriate remedy" provided by subsection (c) gives them standing to assert a claim that only the personal representative has standing to assert on behalf of the Estate. Section 53-7-54(c) provides to a beneficiary the authority to enforce the duties required of the personal representative to perform. It does not provide a

beneficiary the basis for asserting a claim independent of the personal representative.[10]

The Court concludes that Cross Claimants do not have standing to assert an assault and battery claim against Sharon on behalf of the Estate, and Count Three is required to be dismissed.  See Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty., 450 F.3d 1295, 1304 (11th Cir. 2006) ("To demonstrate Article III standing, a 'plaintiff must show that the conduct of which he complains has caused him to suffer an 'injury in fact' that a favorable judgment will redress.'") (quoting Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 12 (2004)).

### 4.    Count Four - Loss of Consortium

Sharon asserts that a claim for loss of consortium is limited to the parties in a marital union, and cannot be asserted by a child of the injured parent.  (Mot. at 8). Cross Claimants do not respond to this argument, and it is deemed unopposed.  LR 7.1(B), NDGa.  Cross Claimants cannot assert a claim for loss of consortium in their individual capacity, because they were not married to Frank.  See W.J.

---

[10]    The Cross Claimants remedy under Section 53-7-54(c) appears to be an action against Sharon to enforce the duties she is required to perform.  This action appears to be one to which the federal court must defer to the Cobb County Probate Courts.  See Marshall v. Marshall, 547 U.S. 293, 311-12 (2006) (probate exception to federal jurisdiction reserves to state probate courts the probate of a will and the administration of a decedent's estate); see also infra at p. 28.

Bremer Co. v. Graham, 312 S.E.2d 806, 808 (Ga. Ct. App. 1983) ("[T]he cause of action for loss of consortium is by its very nature historically and definitionally self-limited to and applicable only to the two parties to the marital union, the spouses, and is, thus, unavailable to the minor child of the tortiously injured parent."); Jordan v. Randolph Cnty. Sch., No. 4:08-CV-131CDL, 2009 WL 1410082, at *9 (M.D. Ga. May 19, 2009) ("Under Georgia law, a loss of consortium claim may be made by one spouse because of a tortious injury to the other spouse . . . ."). Court Four of the Cross Claims is required to be dismissed. See Primera, 450 F.3d at 1304.

    5.    Count Five - Funeral, Burial, Medical, and Other Expenses

Cross Claimants seek to recover "actual damages for funeral, burial, medical, and/or other necessary expenses resulting from the death of [Frank] at the hands of Defendant [Sharon] pursuant to O.C.G.A. § 51-4-5(b)."  (Cross-Cl. ¶ 31).

Section 51-4-5 of the Georgia Code provides that when the "death of a human being results from a crime or from criminal or other negligence, *the personal representative* of the deceased person shall be entitled to recover for the funeral, medical, and other necessary expenses resulting from the injury and death of the deceased person."  O.C.G.A. § 51-4-5(b) (emphasis added).

The plain language of Section 51-4-5(b) provides that it is the personal representative of the deceased person that can bring a claim for funeral, medical, and other necessary expenses.  The Court concludes, as with Count Three, that Count Five is a claim that can only be asserted by the personal representative of the Estate and Cross Claimants cannot establish standing to assert this claim based on Sharon's alleged breach of her fiduciary duty.  Count Five of the Cross Claims is required to be dismissed.  See Primera, 450 F.3d at 1304.

    6. Counts Six and Seven - Accounting and Imposition of Lien

Cross Claimants seek to compel Sharon, as the personal representative of the Estate, to make an immediate "accounting or inventory of the [Estate] items removed, monies received, the date(s) any [Estate] items were sold, the party(ies) to whom sold, the amount of consideration received as to each such item, and the disposition of any consideration received."  (Cross-Cl. ¶¶ 33-34).

Cross Claimants claim that Sharon "is receiving pension and/or retirement monies and is spending said monies and/or is depleting the assets in the Estate . . . ."  (Id. ¶ 36).  They request the Court to impose a lien on the assets of the Estate or impose an injunction "requiring payment of any pension and/or retirement monies to be paid into the registry of the Court or some other acceptable escrow account until such time as this case is tried or settled."  (Id. ¶¶ 37-38).

27

The Court finds that, as with Counts Three and Five, Counts Six and Seven are claims than can only be asserted on behalf of the Estate which Cross Claimants claim do not have standing to assert.  See Primera, 450 F.3d at 1304.

Even if Cross Claimants had standing to assert Counts Six and Seven, these claims directly affect the administration of the Estate and its assets, and the Court would, accordingly, lack jurisdiction to adjudicate these claims under the "probate exception" to federal jurisdiction.  The Supreme Court has "recognized a "probate exception," kin to the domestic relations exception, to otherwise proper federal jurisdiction."  Marshall v. Marshall, 547 U.S. 293, 308 (2006).  "[T]he probate exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court."  Id. at 311-12.  If the Court required the personal representative of the Estate to provide an accounting, or imposed a lien on Estate assets, or required the personal representative to transfer Estate assets into the Court's registry, the Court would be interfering with the administration of the Estate, including by controlling property of the Estate.  The Court lacks jurisdiction over Counts Six and Seven.  Marshall, 547 U.S. at 311-12.  Counts Six and Seven are required to be dismissed.  See id.

### 7.    Count Eight - Punitive Damages

Cross Claimants assert that Sharon "demonstrate intentional or willful misconduct, and an entire want of care and/or indifference to consequences" in murdering or conspiring to murder Frank and that Cross Claimants, thus, are entitled to an award of punitive damages.  (Cross-Cl. ¶ 41).

"Punitive damages are not available in a wrongful death claim . . . since the Georgia statute[], to the extent it permits recovery of more than the actual loss to the survivor, is itself punitive."  Ford Motor Co. v. Stubblefield, 319 S.E.2d 470, 480 (Ga. Ct. App. 1984) (internal citations omitted); see also Sackman v. Balfour Beatty Communities, LLC, No. CV 113-066, 2014 WL 4415938, at *18 (S.D. Ga. Sept. 8, 2014).  Cross Claimants do not cite any authority, and the Court has likewise found none, to support that Cross Claimants are entitled to punitive damages based on Count One of their Cross Claims.  Summary judgment is required to be granted on Count Eight.

### 8.    Count Nine – Attorney's Fees

Cross Claimants assert that, because Sharon "acted in bad faith and has been stubbornly litigious with regard to the transactions that are the subject of the Cross Claim," Cross Claimants are entitled to an award of attorney's fees and costs. (Cross-Cl. ¶ 43).  "The expenses of litigation generally shall not be allowed as a

part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." O.C.G.A. § 13-6-11. Sharon acknowledges that this claim is not an independent cause of action, but instead is derivative and dependent on the success of Cross Claimants' other claims. (Mot. at 12). Sharon asserts that there is no factual basis to support this claim because she did not murder or conspire to murder Frank. (Id.). The Court, having concluded that Counts One and Two may proceed, concludes that summary judgment on Count Nine is not warranted.

## IV.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff Prudential Insurance Company of America's and Defendants Sharon Davidson's, the Estate of Frank W. Davidson's, Matthew T. Davidson's, and Bryan James Davidson's Joint Motion to Interplead and Dismiss Plaintiff The Prudential Insurance Company of America with Prejudice [11] is **GRANTED**. Plaintiff Prudential Insurance Company of America is granted leave to submit the interpleaded funds of $568,000.00, together with applicable accrued interest, to the Clerk of Court within

twenty-one (21) days of this Order.  The Clerk of the Court shall deposit this amount into the Registry of the Court.

**IT IS FURTHER ORDERED** that Plaintiff Prudential Insurance Company of America, upon deposit of the interpleaded funds, is **DISMISSED WITH PREJUDICE** from this action and discharged from any and all liability to the Defendants relating to the Plans or the Death Benefits.

**IT IS FURTHER ORDERED** that Cross Defendant Sharon Davidson's Motion for Summary Judgment [14] is **GRANTED IN PART AND DENIED IN PART**.  Cross Defendant Sharon Davidson's Motion for Summary Judgment is **GRANTED** with respect to Count Eight and **DENIED** with respect to Counts One, Two, and Nine.  Counts Three, Four, Five, Six, and Seven of the Cross Claims are **DISMISSED** for lack of standing.

**SO ORDERED** this 10th day of August, 2015.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE